UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
KRISTA E. NOEL, on behalf of herself and all
others similarly situated,

                                 Plaintiff,

        - against -

PEPSICO, INC. and PEPSICO
ADMINISTRATION COMMITTEE,

                               Defendants.
-------------------------------------------------------------x

**OPINION & ORDER ON MOTION TO DISMISS**

No. 24-CV-7516 (CS)

Appearances:

Oren Faircloth
Lisa R. Considine
Scott Haskins
Siri & Glimstad LLP
New York, New York
*Counsel for Plaintiff*

Gina F. McGuire
Morgan, Lewis & Bockius, LLP
New York, New York

Jeremy P. Blumenfeld
Morgan, Lewis & Bockius, LLP
Philadelphia, Pennsylvania
*Counsel for Defendants*

Seibel, J.

      Defendants Pepsico, Inc. and Pepsico Administration Committee, ("PAC" and together

with Pepsico, Inc., "Pepsi"), have moved to dismiss Plaintiff's Amended Complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF No. 35.)  For the reasons set forth below, Defendants' motion is granted.[1]

## I.      BACKGROUND

For purposes of the motion to dismiss under Rule 12(b)(6), I accept as true the facts, but not the conclusions, set forth in Plaintiff's Amended Complaint.  (*See* ECF No. 22 ("AC").)

### A.      Facts

Plaintiff Krista Noel is an employee of Frito-Lay, a Pepsi subsidiary, and receives health insurance through the PepsiCo Employee Health Care Program Plan (the "Plan").  (AC ¶¶ 1, 8.) Under the Plan, participants who indicate during the enrollment period that they have used tobacco products in the past six months are subject to a tobacco surcharge of $17.31 per week, equating to approximately $900 annually.  (*Id.* ¶¶ 35, 37.)  The surcharge also applies to an employee's spouse or domestic partner who indicates tobacco usage.  (*Id.* ¶ 35.)  The Plan defines "tobacco products" to include "cigarettes, pipes, cigars, e-cigarettes, and dipping/chewing tobacco."  (*Id.*)  Plaintiff alleges that she was required to pay this surcharge. (*Id.*)

To allow participants to avoid this surcharge, the Plan offers a four-week tobacco cessation program called the "Ex Program."  (*Id.* ¶¶ 36-37.)  Participants who indicate during the reenrollment period that they completed the Ex Program between May 1 and November 30 are exempt from the surcharge for the entirety of the following Plan year.  (*Id.* ¶ 36.)  Moreover, participants who do not complete the Ex Program within this time window may nonetheless avoid the surcharge prospectively at any point throughout the Plan year.  (*Id.*)  In other words, if

---

[1] Defendants also filed a letter motion requesting oral argument.  (ECF No. 36.)  That motion is denied.

a participant completes the program before November 30, the surcharge is not employed at all in the following year, and if a participant completes it thereafter, the surcharge will be removed as soon as is administratively practicable, but the participant will not be reimbursed for the portion of the Plan year prior to program completion. (*Id.* ¶¶ 36-37.)[2] According to Plaintiff, the PAC was responsible for deciding which participants satisfied this alternative standard and when the surcharges would stop. (*Id.* ¶ 70.)

After deducting these surcharges from tobacco-using participants' paychecks, Defendants allegedly "deposit[]" them into Pepsi's general accounts, thus earning interest on them. (*Id.* ¶ 46.) Defendants ultimately use the funds generated from these surcharges to offset their own financial contributions to the Plan. (*Id.* ¶¶ 46, 68.)

### B.    Procedural History

Plaintiff filed her initial complaint on October 3, 2024. (ECF No. 1.) On December 27, 2024, Defendants filed a pre-motion letter in anticipation of their motion to dismiss. (ECF No. 16.) The Court held a conference on January 28, 2025, during which it (1) granted Plaintiff leave to file an amended complaint and (2) set a briefing schedule. (*See* Minute Entry dated Jan. 28, 2025.) Plaintiff filed the AC on February 12, 2025, (ECF No. 22),[3] and the instant motion followed. After the motion was filed, both parties submitted several notices of supplemental authority, (ECF Nos. 27, 37, 41-42, 44, 47-48), which the Court has taken into account.

---

[2] Plaintiff does not describe, or challenge, how the Ex Program applies to newly enrolled employees or their spouses/partners, and seems to concede that the Program is acceptable as it applies to new enrollees. (*See* ECF No. 35-3 ("P's Opp.") at 18 n.11.)

[3] Plaintiff first attempted to file the AC on February 11, 2025, but improperly filed it under seal without making an application to do so. (*See* ECF No. 21.)

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on other grounds on reh'g en banc*, 585 F.3d 559 (2d Cir. 2009).[4]  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)); *see Seljak v. Pervine Foods, LLC*, No. 21-CV-9561, 2023 WL 2354976, at *4 (S.D.N.Y. Mar. 3, 2023).  Where a party lacks standing to bring a claim, the court lacks subject-matter jurisdiction over that claim and must dismiss it.  *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020).

"The party invoking federal jurisdiction bears the burden of establishing" that it exists, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and "the plaintiff must allege facts that affirmatively and plausibly suggest that [she] has standing to sue," *Seljak*, 2023 WL 2354976, at *4.  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim,* 838 F.3d 129, 134 (2d Cir. 2016); *see Tyrnauer v. Ben & Jerry's Homemade, Inc.*, 739 F. Supp. 3d 246, 254 (D. Vt. 2024); *Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 88 (S.D.N.Y. 2022), *vacated on other grounds sub nom. Passman v. Peloton Interactive, Inc.*, No. 19-CV-11711, 2025 WL 1284718 (S.D.N.Y. May

---

[4] Unless otherwise noted, case quotations omit all internal quotation marks, citations, alterations, and footnotes.

2, 2025).  And while "'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it,'" *Kell v. Lily's Sweets, LLC*, No. 23-CV-147, 2024 WL 1116651, at *2 (S.D.N.Y. Mar. 13, 2024) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)), the Court, on a facial challenge to subject-matter jurisdiction, "presume[s] that general allegations embrace those specific facts that are necessary to support the claim," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 58 (2d Cir. 2016).  Furthermore, "a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

B.     **Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  While Rule 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

III.   **DISCUSSION**

A.   **Statutory and Regulatory Framework**

The Employee Retirement Income Security Act ("ERISA") prohibits group health plans from requiring participants to pay higher premiums or contributions than similarly situated individuals based on health status-related factors.  29 U.S.C. § 1182(b)(1).  The statute clarifies, however, that this prohibition should not be construed to prevent group health plans "from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention." *Id.* § 1182(b)(2)(B).  "Taken together, these two statutory provisions allow a plan to issue discounts or rebates to participants that do not use tobacco if the plan has implemented a valid wellness program." *Mehlberg v. Compass Grp. USA, Inc.*, No. 24-CV-4179, 2025 WL 1260700, at *2 (W.D. Mo. Apr. 15, 2025).

The Public Health Service Act ("PHSA"), which was amended and incorporated into ERISA in 2010 by the Patient Protection and Affordable Care Act, *see* 29 U.S.C. § 1185d(a)(1); *Plesha v. Ascension Health Alliance*, No. 24-CV-1459, 2026 WL 279321, at *2 (E.D. Mo. Feb. 3, 2026), sets forth the conditions that a wellness initiative must meet to qualify as a permissible program of health promotion or disease prevention rather than a discriminatory surcharge, *see* 42

U.S.C. § 300gg-4(j).  In particular, where a wellness program conditions "a premium discount, rebate, or reward" on a participant's satisfaction of "a standard that is related to a health status factor," five requirements must be met.  *Id.* § 300gg-4(j)(3).  First, the value of the reward – which can take the form of "a discount or rebate of a premium or contribution, a waiver of all or part of a cost-sharing mechanism (such as deductibles, copayments, or coinsurance), the absence of a surcharge, or the value of a benefit that would otherwise not be provided under the plan" – may not exceed thirty percent (or in some instances, fifty percent) of the cost of coverage.  *Id.* § 300gg-4(j)(3)(A); *see* 29 C.F.R. § 2590.702(f)(5)(i).  Second, the wellness program must be "reasonably designed to promote health or prevent disease" in that it "has a reasonable chance of improving the health of, or preventing disease in, participating individuals and it is not overly burdensome, is not a subterfuge for discriminating based on a health status factor, and is not highly suspect in the method chosen to promote health or prevent disease."  42 U.S.C. § 300gg-4(j)(3)(B).  Third, plans must provide at least one opportunity per year for participants to qualify for the reward under the program.  *Id.* § 300gg-4(j)(3)(C).  Fourth, "[t]he full reward under the wellness program shall be made available to all similarly situated individuals."  *Id.* § 300gg-4(j)(3)(D).  This condition is met only where the program allows for a reasonable alternative standard (or waiver of the otherwise applicable standard) for participants for whom "it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard" or for whom it is "medically inadvisable to attempt to satisfy" this standard.  *Id.*  And fifth, any plan materials describing the terms of the wellness program must also disclose the availability of a reasonable alternative standard.  *Id.* § 300gg-4(j)(3)(E).

In 2013, the Department of Labor ("DOL") promulgated regulations (the "Regulations") incorporating these statutory requirements into its regulations governing wellness programs.  *See*

Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33158, 33181-86 (June 3, 2013) (codified at 29 C.F.R. § 2590.702).  These Regulations expound upon the statutory requirements delineated above and provide a series of examples of how compliant wellness programs may be structured.  *See generally id.*  Further, the Regulations impose particular requirements based on the type of wellness program at issue.  The first category, "participatory programs," requires only participation in the program rather than the attainment of a particular goal, such as "[a] program that reimburses employees for the costs of participating, or that otherwise provides a reward for participating, in a smoking cessation program without regard to whether the employee quits smoking."  *See* 29 C.F.R. § 2590.702(f)(1)(ii)(D).  The second category, "health-contingent programs," encompasses programs which require participants "to satisfy a standard related to a health factor to obtain a reward."  *Id.* § 2590.702(f)(1)(iii).  Within the category of health-contingent programs, the Regulations differentiate between "activity-only programs," which "require[] an individual to perform or complete an activity related to a health factor," *id.* § 2590.702(f)(1)(iv); and "outcome-based programs," which "require[] an individual to attain or maintain a specific health outcome," such as smoking cessation, *id.* § 2590.702(f)(1)(v).

The Regulations note, however, that the availability of an alternative to an outcome-based program for individuals who do not attain the specified health outcome does not transform it into a participatory program.  For example, a program that has an initial standard of non-smoking status and offers participation in a smoking cessation program as an alternative is nonetheless an outcome-based program.  *Id.*  And if a wellness program is outcome-based, the Regulations specify that – to ensure that the program is "reasonably designed to promote health or prevent disease" rather than "a subterfuge for underwriting or reducing benefits based on a health factor"

8

– the program must offer a reasonable alternative standard to qualify for the reward to "any individual who does not meet the initial standard." *Id.* § 2590.702(f)(4)(iii). Accordingly, where an individual seeks a reasonable alternative standard under an outcome-based wellness program, the Regulations provide that it is "not reasonable" for a Plan to seek verification "that a health factor makes it unreasonably difficult for the individual to satisfy, or medically inadvisable for the individual to attempt to satisfy, the otherwise applicable standard as a condition of providing a reasonable alternative to the initial standard." *Id.* § 2590.702(f)(4)(iv)(E).

The preamble to the Regulations states the following regarding the "reasonable alternative standard" requirement:

> [I]n order to satisfy the requirement to provide a reasonable alternative standard, the same, full reward must be available under a health-contingent wellness program (whether an activity-only or outcome-based wellness program) to individuals who qualify by satisfying a reasonable alternative standard as is provided to individuals who qualify by satisfying the program's otherwise applicable standard. Accordingly, while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine how to provide the portion of the reward corresponding to the period before an alternative was satisfied (*e.g.*, payment for the retroactive period or pro rata over the remainder of the year) as long as the method is reasonable and the individual receives the full amount of the reward. In some circumstances, an individual may not satisfy the reasonable alternative standard until the end of the year. In such circumstances, the plan or issuer may provide a retroactive payment of the reward for that year within a reasonable time after the end of the year, but may not provide pro rata payments over the following year (a year after the year to which the reward corresponds). The Departments may provide additional subregulatory guidance if questions persist or if the Departments become aware of payment designs that seem unreasonable with respect to individuals who satisfy the reasonable alternative standard.

9

Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. at

33163.  A few months later, on January 9, 2014, the DOL indeed posted "additional

subregulatory guidance" on its website by providing answers to "Frequently Asked Questions"

regarding, *inter alia*, the implementation of the regulations governing nondiscriminatory

wellness programs.  The first question and answer pertaining to wellness programs were as

follows:

> Q8: A group health plan charges participants a tobacco premium surcharge but also provides an opportunity to avoid the surcharge if, at the time of enrollment or annual reenrollment, the participant agrees to participate in (and subsequently completes within the plan year) a tobacco cessation educational program.  A participant who is a tobacco user initially declines the opportunity to participate in the tobacco cessation program, but joins in the middle of the plan year.  Is the plan required to provide the opportunity to avoid the surcharge or provide another reward to the individual for that plan year?
>
> No.  If a participant is provided a reasonable opportunity to enroll in the tobacco cessation program at the beginning of the plan year and qualify for the reward (*i.e.*, avoiding the tobacco premium surcharge) under the program, the plan is not required (but is permitted) to provide another opportunity to avoid the tobacco premium surcharge until renewal or reenrollment for coverage for the next plan year.  Nothing, however, prevents a plan or issuer from allowing rewards (including pro-rated rewards) for mid-year enrollment in a wellness program for that plan year.

*FAQs About Affordable Care Act Implementation (Part XVIII) and Mental Health Parity*

*Implementation*, U.S. Dep't of Lab. (Jan. 9, 2014),

https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-

part-18.

## B.    <u>Standing</u>

Plaintiff alleges that Defendants' tobacco surcharge is unlawful because participants who

complete the Ex Program mid-year do not receive retroactive reimbursement for surcharges

already paid during that year, thus violating ERISA's requirement that participants satisfying the

reasonable alternative standard receive the "full reward" under the program.  (*See generally* AC.)

10

She further argues that Defendants fail to communicate the availability of a reasonable alternative standard in all Plan materials discussing the surcharge, (*id.* ¶¶ 62-63), and that Defendants breached their fiduciary duty by implementing an unlawful program and using unlawfully collected funds to offset their own contributions to the Plan, (*id.* ¶¶ 66-78).

Defendants first contend that Plaintiff lacks standing to pursue her claims. In so arguing, Defendants submit a declaration certifying that Plaintiff only paid the tobacco surcharge for several months in 2024. (ECF No. 35-1 ("Ds' Mem.") at 11-12; ECF No. 35-2 ("Declaration").) The Declaration explains that Pepsi provides a "grace period" for new enrollees who indicate recent tobacco use during annual enrollment. (Declaration ¶ 2.) The grace period is from January 1 through July 1 of the following year, (*id.*), such that instead of the surcharge taking effect in January, as it would for an existing member, the new enrollee has an extra six months. This allows new participants with a history of smoking a cushion of time to complete the Ex Program; so long as they complete the program within the grace period, they will never pay the surcharge. (*Id.* ¶ 3.) According to the Declaration, Plaintiff's spouse disclosed recent tobacco usage when they enrolled in the Plan in October 2023, and he failed to complete the Ex Program during the grace period. (*Id.* ¶¶ 7-8, 11.) Plaintiff was thus charged the tobacco surcharge beginning July 1, 2024. (*Id.* ¶¶ 10-11.) During annual reenrollment in October 2024, according to the Declaration, both Plaintiff and her spouse indicated recent tobacco usage. (*Id.* ¶ 13.) But because they both completed the Ex Program before November 30, 2024, they did not pay any portion of the tobacco surcharge for the 2025 Plan year. (*Id.* ¶¶ 14-16.)

Courts may consider evidence outside the pleadings when deciding a fact-based motion seeking dismissal on standing grounds. *See Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024). Nonetheless, "[i]f the evidence proffered by the Defendant is immaterial because it does

not contradict plausible allegations that are themselves sufficient to show standing, then the Court need only rely on the allegations in Plaintiff's Complaint." *Ham v. Lenovo (United States) Inc.*, 664 F. Supp. 3d 562, 575 (S.D.N.Y. 2023); *see Carter*, 822 F.3d at 57.

The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61.  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

### 1.    Tobacco Surcharge

According to Defendants, the added facts – which Plaintiff does not dispute – demonstrate that Plaintiff's injury is not traceable to the conduct with which she takes issue. (Ds' Mem. at 12-14.)  Specifically, Defendants note that Plaintiff challenges the requirement that Plan participants complete the Ex Program between May 1 and November 30 of the prior Plan year in order to avoid the surcharge for the full following year.  (*Id.* at 12 (citing AC ¶¶ 36-37).) They argue that this time limitation never actually affected Plaintiff, as she was only subject to the tobacco surcharge after her spouse failed to complete the Ex Program during the six-month grace period at the beginning of 2024.  (*Id.* at 13.)  Because Plaintiff could have avoided the surcharge during the 2024 Plan year itself, Defendants contend that her injuries are not traceable to the challenged conduct – namely, Defendants' requirement that re-enrollees complete the Ex Program prior to the beginning of the next Plan year.  (*Id.*)  Further, Defendants argue that

Plaintiff was not impacted by the Plan's allegedly deficient notices, pointing out that Plaintiff and her spouse eventually completed the Ex Program even though nothing about the Plan's notices had changed between the end of the grace period and their completion of the program. (*Id.* at 13-14.)  Defendants thus contend that because she does not allege that she was unaware of the program due to the alleged notice deficiencies, she has not suffered an injury traceable to any deficiency in their notices to participants regarding the Plan.  (*Id.*)

But Defendants' added facts regarding the timing of Plaintiff's completion of the Ex Program and her prior knowledge of the program do not contradict Plaintiff's allegation that she paid a surcharge that she contends was unlawful.  This allegation suffices to establish a concrete harm for standing purposes.  *See Isayeva v. Diamond Braces*, No. 22-CV-4575, 2024 WL 1053349, at *16 (S.D.N.Y. Mar. 11, 2024) ("[M]onetary harms . . .  readily qualify as concrete injuries under Article III.").  Plaintiff's theory of the case is that Pepsi's wellness program failed to satisfy the requirements set forth by ERISA, and that any tobacco surcharge it imposed on participants – regardless of when, if ever, they completed the Ex Program – was thus unlawful discrimination based on a health factor.  (*See, e.g.*, AC ¶ 7.)  In other words, because the default under ERISA is that a surcharge based on a health factor is unlawful, and the only way to avoid this conclusion is by complying with all of the requirements governing wellness programs, the result of Defendants' failure to satisfy these requirements is that any additional charges based on tobacco usage violated ERISA.  Plaintiff need not allege that she was specifically impacted by the elements of the Ex Program that rendered it noncompliant; the mere fact that Defendants

required her to pay a surcharge without offering a compliant program suffices to establish that her injury is traceable to Defendants' unlawful conduct.[5]

In addressing this precise issue, several courts have recently held that plaintiffs have standing where they claim that they paid a tobacco surcharge imposed pursuant to a noncompliant wellness program, regardless of whether they were directly impacted by the alleged shortcomings of the program. *See, e.g.*, *Wilson v. Whole Food Mkt., Inc.*, No. 25-CV-85, 2026 WL 196517, at *5 (W.D. Tex. Jan. 20, 2026) ("Defendants imposed a surcharge on Plaintiffs. Plaintiffs allege that the imposition of this surcharge, as carried out by Defendants, is unlawful because it violates ERISA. These allegations are plainly sufficient . . . ."); *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 24-CV-2749, 2025 WL 2779899, at *6 (W.D. Tenn. Sept. 26, 2025) ("For a wellness program . . . to be lawful, it must satisfy all the relevant requirements. So if its program does not meet the relevant requirements, [defendant] cannot impose a surcharge on tobacco users, which would mean the tobacco surcharge that Plaintiff has been paying is illegal. And with this, Plaintiff alleges an injury-in-fact."); *Fisher v. GardaWorld Cash Serv. Inc.*, No. 24-CV-837, 2025 WL 2484271, at *6 (W.D.N.C. Aug. 28, 2025)

---

[5] Defendants argue that Plaintiff's standing is "narrow[ed]" to the period during which she paid the surcharge, and that that injury was traceable not to their conduct but rather to Plaintiff's spouse's choice not to complete the program during the grace period. (Ds' Mem. at 12.) In so doing, they "impl[y] that Article III permits only one legally responsible cause per injury. But that is not even how the concept of 'proximate' cause works, much less how the 'fairly traceable' requirement works." *New York v. United States Dep't of Com.*, 351 F. Supp. 3d 502, 622 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 588 U.S. 752 (2019). "[A] defendant's conduct need *only* be a 'but-for' cause of a plaintiff's injuries in the sense that its removal from the causal chain, through the relief sought in the action, will be likely to redress the injuries." *Id.* (emphasis in original). Defendants' program is obviously a link in the causal chain, even if there is an additional cause of Plaintiff's injury. And, for the reasons stated in the text, Plaintiff has standing even if her injury was not caused by the aspects of the program that render it noncompliant.

("Assuming Plaintiffs are correct on the merits, they have alleged a concrete injury (their surcharge payments) that is traceable to [defendant]'s decision to impose tobacco . . . surcharges under a discriminatory ERISA plan, which can be redressed by a refund of the surcharge."); *Chirinian v. Travelers Cos.*, No. 24-CV-3956, 2025 WL 2147271, at *5 (D. Minn. July 29, 2025) (plaintiff had standing to challenge wellness program that allegedly failed to satisfy ERISA's requirements despite not participating in program because "payment of a fee that she had a statutory right not to be charged counts as a concrete injury for standing purposes"); *Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882, 894 (E.D. Va. 2025) ("Plaintiffs' injuries also stand 'fairly traceable' to the Defendant's challenged conduct, because absent Defendant's alleged administration of its non-compliant wellness program, Plaintiffs would not have had to pay an unlawful surcharge."); *Mehlberg*, 2025 WL 1260700, at *3 (plaintiffs had standing to sue based on noncompliant tobacco cessation program, even where they never participated in program, because "[a] statutory right not to be charged causes a particularized injury that affects the class members in a personal and individual way").  Although these decisions vary as to the merits of Plaintiff's claims, as discussed more fully below, the Court sees no reason to depart from the majority as to the question of standing.[6]

---

[6] One recent case, *Plesha v. Ascension Health Alliance*, came to the opposite conclusion, holding that the plaintiff did not have standing to contest the defendant's plan disclosures because she had not alleged how the alleged deficiencies in these disclosures impacted her behavior or how they resulted in her monetary injuries.  *See Plesha*, 2026 WL 279321, at *7.  The court in *Plesha* considered Plaintiff's notice claims to allege "purely informational injuries" that failed to "satisfy Article III's concreteness requirement."  *Id.*  The court did not address, however, the argument that the various courts discussed above found persuasive – namely, that the failure to satisfy all of ERISA's requirements renders a wellness program, as well as any surcharges applied thereunder, unlawful.  *See, e.g.*, *Bailey*, 2025 WL 2779899, at *6 (rejecting argument that plaintiff's failure-to-notify claims were premised on "informational injuries" because plaintiff was not alleging "that the failure to notify injured her," but rather that the failure to notify "would make the surcharge itself illegal" and that she suffered a direct injury by

### 2.    Fiduciary Duty

Plaintiff has sufficiently alleged standing to pursue her breach of fiduciary duty claim on the same grounds.[7]  The allegations underlying this claim are that Defendants breached their fiduciary duty by failing to "adequately monitor and review the terms of the wellness program to ensure compliance with ERISA and the regulatory framework" and by "assessing and collecting the unlawful tobacco surcharges."  (AC ¶¶ 70-71.)  Plaintiff further alleges that Defendants then improperly deposited the surcharges they collected into Pepsi's general accounts, earned interest on them, and thereby "reduc[ed] their own financial contributions to the Plan."  (*Id.* ¶ 46.)  Put simply, Plaintiff argues that Defendants had a duty to ensure compliance with ERISA and that their failure to do so, in furtherance of their own financial benefit, caused her and other plan members injury in the form of the unlawful surcharge.  Regardless of the merits of this argument, Plaintiff has sufficiently alleged that she was injured by Defendants' improper conduct for standing purposes.  *See Wilson*, 2026 WL 196517, at *6 ("Plaintiffs' fiduciary duty claims are tied to their claims that Defendants' imposition of the tobacco surcharge is unlawful. . . . Because these claims depend on whether Defendants have violated ERISA through its imposition of the tobacco surcharge, Plaintiffs have standing to bring their fiduciary duty claims for the same reasons described above."); *see also* Order at 18 n.3, Waggoner v. The Carle Found., No.

---

paying this illegal surcharge).  The Court therefore respectfully disagrees with *Plesha*'s conclusion on this issue.

[7] Although Defendants do not separately contest Plaintiff's standing with respect to her fiduciary duty claim, "standing is not dispensed in gross, and a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Dubois v. Maritimo Offshore Pty Ltd.*, No. 15-CV-1114, 2019 WL 13222941, at *1 (D. Conn. May 20, 2019).  Thus, "[a] federal court is obliged to assure itself that a plaintiff has standing and must dismiss a complaint if at any time it determines that the plaintiff cannot carry his burden to prove standing."  *Id.*

24-CV-2217 (C.D. Ill. Sept. 15, 2025), ECF No. 27 (plaintiff had standing to assert fiduciary duty claims based on allegations "mirror[ing]" those regarding tobacco surcharge, as both involved concrete monetary harm).  And because she seeks various forms of relief that would remedy this alleged harm – including, *inter alia*, "restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations," (AC at 31) – the Court declines to dismiss this claim on standing grounds.

The Court acknowledges that one recent decision addressing this issue came to the opposite conclusion.  *See Williams v. Bally's Mgmt. Grp., LLC*, No. 25-CV-147, 2025 WL 3078747, at *6 (D.R.I. Nov. 4, 2025), *appeal filed*, No. 25-2159 (1st Cir. Dec. 10, 2025).  The court in *Williams* held that the plaintiff's allegations regarding the imposition of the surcharge were insufficient to establish an injury under 29 U.S.C. § 1132(a)(2) – the ERISA provision permitting suits based on breach of fiduciary duty – because this provision only provides a remedy for injuries to the *plan*, not for injury to individual participants.  *Id.* at *5-6.  While it is true that this provision "authorizes suits only brought in a representative capacity on behalf of the plan" and does not support claims for individual relief, *AutoExpo Ent. Inc. v. Elyahou*, No. 23-CV-9249, 2025 WL 2637493, at *4 (E.D.N.Y. Sept. 12, 2025), *reconsideration denied*, 2026 WL 177789 (E.D.N.Y. Jan. 22, 2026), whether a plaintiff is entitled to relief under a particular statute is a merits inquiry.  To address the standing inquiry, the Court need only determine whether the plaintiff has alleged an injury-in-fact that is traceable to the defendant's conduct and redressable by the requested relief, *see Duke v. Luxottica U.S. Holdings Corp.*, No. 24-3207, 2026 WL 303549, at *6 (2d Cir. Feb. 5, 2026) (rejecting argument that plaintiff did not have standing where her requested remedy was "categorically unavailable under Section 502(a)(2)" because "this argument target[ed] the merits of [plaintiff]'s claims, not her standing to pursue

17

them"); *Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*, 140 F.4th 60, 67 n.5 (2d Cir. 2025) ("ERISA 'statutory standing' is non-jurisdictional."); *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("[T]he absence of a valid cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case."); *see also Draney v. Westco Chemicals, Inc.*, No. 19-CV-1405, 2019 WL 6465510, at *3 (C.D. Cal. Dec. 2, 2019) (differentiating between ERISA's statutory requirement requiring participants seek recovery on behalf of the plan and "Article III standing," which only requires plaintiff to establish injury-in-fact, causation, and redressability); *AutoExpo Ent. Inc.*, 2025 WL 2637493, at *5 (differentiating between so-called "statutory standing" under ERISA and constitutional standing).

And the cases on which *Williams* relied do not support the proposition that plaintiffs, in addition to satisfying the core Article III requirements, must demonstrate that the statute under which they sue can provide their requested relief. *See Williams*, 2025 WL 3078747 at *5 (first citing *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 543-44 (2020) (plaintiffs who did seek to sue as representatives of a plan under 29 U.S.C. § 1132(a)(2) nonetheless lacked standing for failure to allege that they themselves had suffered a concrete injury, as "the cause of action does not affect the Article III standing analysis"); and then citing *N.R. by & through S.R. v. Raytheon Co.*, 24 F.4th 740, 750-51 (1st Cir. 2022) (holding that plaintiff failed to state claim where allegations involved injury to individual plan member rather than to plan, but not addressing standing)). Thus, the Court concludes that *Williams* "conflate[d] the merits of a fiduciary breach claim, which does require loss or harm to the Plan, with the standing inquiry," *see Wilson*, 2026 WL 196517 at *6 n.7, and respectfully disagrees with the *Williams* court on this issue.

18

### 3.    Injunctive Relief

The Court agrees with Defendants, however, that Plaintiff does not have standing to seek injunctive or other prospective relief.  To seek such relief, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson*, 36 F. App'x 663, 668 (2d Cir. 2002) (summary order).  "A plaintiff's few words of general intent, without substantial evidence of plans, do not support a finding of an actual or imminent injury." *Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 111 (2d Cir. 2023).

Even disregarding Defendants' Declaration, which indicates that Plaintiff and her spouse completed the Ex Program and thus were not subject to the surcharge in 2025, (Declaration ¶¶ 14-16), the Court finds that the AC – which contains no allegations suggesting that Plaintiffs will disclose tobacco use or decline to participate in the Ex Program moving forward – fails to establish any likelihood of future injury justifying prospective relief.  In her opposition, Plaintiff argues that "[i]f she or her spouse indicated tobacco use, and they do not complete the program again in the next several months (before the arbitrary November 2025 [*sic*]), Plaintiff will be charged again starting in 2026 under a wellness program that violates ERISA's requirement." (P's Opp. at 11-12.)  But this hypothetical assertion does not even amount to "words of general intent," let alone "substantial evidence of plans." *See Saba Cap. Cef Opportunities 1, Ltd.*, 88 F.4th at 111.

Plaintiff argues that she has standing to pursue prospective relief on behalf of the Plan via her § 502(a)(2) claim, as "'a plan participant may have Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant.'"  (P's Opp. at 11 n.5 (quoting *Cent. States Se. & Sw. Areas*

*Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005).)  But as Defendants point out, the case Plaintiff relies on for this proposition was decided before *Thole*, which held that "[t]here is no ERISA exception to Article III."  590 U.S. at 547. Given that the *Thole* Court, in rejecting plaintiff's breach of fiduciary duty claim for lack of standing, made no distinction between the compensatory and injunctive relief they sought, *see* 590 U.S. at 541-46, the Court cannot justify drawing such a distinction here.

## C.    Merits

### 1.    Tobacco Surcharge

The gravamen of the AC is that Defendants' tobacco surcharge fails to comply with ERISA's requirements.  Specifically, Plaintiff argues that by failing to retroactively reimburse participants who complete the Ex Program during the Plan year for any surcharge payments already remitted during that Plan year, Defendants violate the requirement that "[t]he full reward under the wellness program" be made available to all similarly situated participants.  42 U.S.C. § 300gg-4(j)(3)(D).

#### a.    Medical Hardship Standard

Defendants first oppose Plaintiff's argument by contending that Plaintiff (and her spouse) were never entitled to a reasonable alternative standard, as "the Complaint does not allege that either of them has a medical condition that makes it 'unreasonably difficult' or 'medically inadvisable' to cease using tobacco."  (Ds' Mem. at 14-15 (quoting 42 U.S.C. § 300gg-4(j)(3)(D)(i)(I), (II).)  Accordingly, Defendants argue, ERISA did not require Pepsi to provide Plaintiff with a reasonable alternative standard in the first place, as the "full reward" was "available" to her under the initial standard – *i.e.*, not using tobacco.  (*Id.*)  Plaintiff counters that

20

under the Regulations, this medical hardship standard applies only to "activity-only" wellness programs, not to "outcome-based" programs like the one at issue here.  (P's Opp. at 19-20.)[8]

Even if I were to disregard the Regulations entirely on this point, Defendants' argument nonetheless fails.  Plaintiff's claim does not rest on whether Defendants were required to provide a reasonable alternative standard to any participant who did not meet the initial standard of being a nonsmoker or merely those who demonstrated medical hardship.  Rather, her claim is that she

---

[8] The parties dispute whether the Regulations are controlling on this issue, given that they appear to demand more than the statute requires.  Plaintiff is correct that, pursuant to the Regulations, "a reward under an outcome-based wellness program is not available to all similarly situated individuals for a period unless the program allows a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for *any individual who does not meet the initial standard*." 29 C.F.R. § 2590.702(f)(4)(iv)(A) (emphasis added).  The statute, in contrast, requires the reasonable alternative standard only for participants for whom the initial standard is medically contraindicated.  *See* 42 U.S.C. § 300gg-4(j)(3)(D).  Although the Preamble to the Regulations does not have the force of law, *see Seife v. U.S. Dep't of Health & Hum. Servs.*, 440 F. Supp. 3d 254, 275 (S.D.N.Y. 2020) (interpretation contained only in preamble was not promulgated pursuant to agency's authority to make rules carrying the force of law); *Saunders v. City of N.Y.*, 594 F. Supp. 2d 346, 355 (S.D.N.Y. 2008) (preambles lack the force of law and do not merit deference when construing governing statute), *reconsideration denied*, 2009 WL 90621 (S.D.N.Y. Jan. 13, 2009), it explains why the Regulations require more extensive access to the reasonable alternative standard under outcome-based (but not activity-based) programs:  outcome-based programs must offer the reasonable alternative standard to a "broader group of individuals than is required for activity-only wellness programs" in order to "ensure that the program is reasonably designed to improve health and is not a subterfuge for underwriting or reducing benefits based on health status."  Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. at 33160.  That the program is reasonably designed and not a subterfuge is also required by the statute.  *See* 42 U.S.C. § 300gg-4(j)(3)(B).  Accordingly, requiring a reasonable alternative for outcome-based programs regardless of medical hardship does not necessarily "read[] the 'medical condition,' 'unreasonably difficult,' and 'medically inadvisable' provisions out of the statute entirely," as Defendants contend, (Ds' Mem. at 16), but is arguably justified by an understanding that programs expressly based on attaining a particular health outcome may be more likely to act as a subterfuge for discrimination based on health factors than those which merely require participants to engage in a specified activity, *see Bailey*, 2025 WL 2779899, at *9 ("[Defendant] glosses over the possibility that, rather than conflicting with the PHSA, the regulatory framework properly fills in its details and clarifies the requirements for outcome-based programs.").  But in light of my conclusion that Defendants' argument fails regardless, I need not decide whether this interpretation reflects the best reading of the statute.

21

was required to pay an invalid surcharge.  As discussed above, if Defendants' wellness program failed to comply with the statutory requirements, the imposition of the tobacco surcharge on any participant was a violation of ERISA.  Therefore, the question is not whether Plaintiff or her husband would be entitled to a reasonable alternative standard absent a showing of medical hardship, but whether Defendants' wellness program, as a whole, complied with ERISA.  And the AC alleges that Defendants refuse to retroactively reimburse *anyone* who completes the Ex Program mid-year, irrespective of whether they could have met the initial standard without hardship.  (AC¶ 31.)  Accordingly, if the term "full reward" necessarily requires retroactive reimbursement after the completion of a reasonable alternative standard, as Plaintiff argues, Defendants' Plan would be deficient and any surcharge imposed unlawful.  *See Wilson*, 2026 WL 196517, at *11.  Whether Plaintiff herself would be statutorily entitled to a reasonable alternative standard is thus immaterial.

### b.    "Full Reward"

The Court thus turns to Plaintiff's primary issue with Defendants' wellness program: Defendants' refusal to retroactively reimburse participants who complete the Ex Program during the Plan year.  According to Plaintiff, "if a plan offers a reasonable alternative standard throughout the plan year, it must ensure that ***every participant*** who satisfies the alternative standard ***receives the same full reward*** as those who met the initial standard at the outset."  (AC ¶ 28 (emphases in original).)  Because participants who complete the Ex Program mid-year only have the surcharge removed prospectively and cannot recover the amounts they already paid, Plaintiff argues that these participants are only receiving a portion of the reward, rather than the full amount that nonsmokers received.  (*Id.* ¶¶ 3, 6, 29.)

22

Neither ERISA nor the regulations implemented pursuant to it "clearly define the term 'full reward.'" *Williams*, 2025 WL 3078747, at *9; *see* 29 C.F.R. § 2590.702(f)(4)(iv); 42 U.S.C. § 300gg-4(j)(3)(D).  As a threshold matter, the Court is not convinced that the "full reward" requirement entitles participants who complete a reasonable alternative standard to an amount reflective of the entire Plan year.  If an employer creates a program where the reward is the absence of a surcharge, and the surcharge is indeed fully removed once participants complete the reasonable alternative standard, it would be logical to conclude that the employer has thus provided the full reward – *i.e.*, the complete removal of the surcharge.  Nor does this reading of the statute render the word "full" superfluous, as Plaintiff argues.  (*See* P's Opp. at 13.)  For example, consider a program that removed a surcharge entirely for participants who indicated that they did not smoke, but provided that smokers were entitled to a reduced surcharge for completing a smoking cessation program.  It is clear that such a program would not offer the "full reward."  What is less clear, however, is that employers must provide the "full reward" *for the entire plan year*.  *See Williams*, 2025 WL 3078747, at *11 ("Whether an individual who receives only a prospective 'absence of a surcharge' halfway through the plan year obtains the same reward as an individual who did not have to pay the surcharge from the beginning of the year is a matter of perspective:  while on the one hand the first individual received a different reward because that individual had to pay the tobacco surcharge up until the time they completed the program, on the other hand both receive the same reward of not being prospectively charged a tobacco surcharge."); *Plesha*, 2026 WL 279321, at *5 (to the same effect).

 In support of her interpretation of "full reward," Plaintiff points to the preamble to the Regulations, which she claims "explicitly rejected Defendants' argument that there is no retroactive reimbursement requirement."  (P's Opp. at 16.)  While Plaintiff acknowledges that

the Supreme Court's recent decision in *Loper Bright* "eliminated *Chevron* deference to agency interpretations of ambiguous *statutes*," (P's Opp. at 17 (emphasis in original) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)), she nonetheless argues that *Loper Bright* "did not eliminate *Auer* deference to an agency's interpretation of its own *regulations*," to which courts must still defer, (*id.* at 17 (emphasis in original) (first citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997); and then citing *Kisor v. Wilkie*, 588 U.S. 558, 588–89 (2019))).  This argument, however, fails to grapple with the fact that the regulation at issue merely repeats the "full reward" language from the statute verbatim.  *Compare* 29 C.F.R. § 2590.702(f)(4)(iv) ("The full reward under the outcome-based wellness program must be available to all similarly situated individuals."), *with* 42 U.S.C. § 300gg-4(j)(3)(D) ("The full reward under the wellness program shall be made available to all similarly situated individuals.").  Under the so-called "anti-parroting doctrine," "a court need not defer to an agency's interpretation of a parroting regulation because an agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language."  *Williams*, 2025 WL 3078747, at *9; *see Plesha*, 2026 WL 279321, at *6 (declining to defer to the DOL's interpretation of "full reward" under the "anti-parroting doctrine," as "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute"); *Buescher v. N. Am. Lighting, Inc.*, 791 F. Supp. 3d 873, 906 (C.D. Ill. 2025) ("[D]eferring to the DOL's interpretation of its regulation under *Auer*, when deference to the DOL's interpretation of the

24

effectively identical language of the PHSA would be forbidden, would seem to be an improper end run around *Loper Bright*.").[9]  *Auer* deference would thus be inappropriate on this issue.[10]

But even if the Court were to agree with Plaintiff that "full reward" must mean the full amount across the entire Plan year, Defendants' program would nonetheless satisfy this requirement.  As the AC concedes, Plan participants have the opportunity to avoid the entire surcharge for the full Plan year by completing the Ex Program between May 1 and November 30 of the prior Plan year.  (AC ¶ 36.)  Thus, unlike plans which permit participants to complete a reasonable alternative at any time during the plan year to remove the surcharge on a going-forward basis only, Defendants explicitly allowed participants to avoid the surcharge entirely by completing the Ex Program within the designated period during the previous year.  *See*

---

[9] Similarly, Plaintiff cites DOL's position in *Sec'y of Lab. v. Macy's, Inc.* as further evidence that the DOL interprets the "full reward" requirement to require retroactive reimbursement.  (*See* P's Opp. at 14-15 (citing *Sec'y of Lab. v. Macy's, Inc.*, No. 17-CV-541, 2021 WL 5359769, at *15 (S.D. Ohio Nov. 17, 2021), *reconsideration denied*, 2022 WL 407238 (S.D. Ohio Feb. 10, 2022)).)  But "[b]oth before and after *Auer*, the Supreme Court has declined to defer to what appears to be nothing more than an agency's convenient litigating position." *Plesha*, 2026 WL 279321, at *6 (first citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988); and then citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

Plaintiff further argues that "*Loper Bright* did not authorize courts to disregard regulations that were properly promulgated under an agency's statutory authority."  (P's Opp. at 17.)  That an agency is empowered to promulgate regulations under a statute, however, does not mean that such regulations may be enforced via civil suit.  *See Dimps-Hall v. Emp. Benefit Plan Admin. Comm. HSBC-N. Am.*, No. 25-CV-421, 2026 WL 305485, at *9 (S.D.N.Y. Feb. 5, 2026). Indeed, as Plaintiff later concedes, her claims are based on ERISA's statutory provisions, and she "relies on the Final Regulations not to assert standalone claims, but as interpretive tools."  (P's Opp. at 22.)

[10] Although the Court acknowledges that the statutory provision at issue incorporated language from 2006 DOL wellness program regulations, *see* Nondiscrimination and Wellness Programs in Health Coverage in the Group Market, 71 Fed. Reg. 75014 (Dec. 13, 2006), this does not warrant "stretch[ing] *Auer* deference through 42 U.S.C. § 300gg-4(j)(3)(D) to its regulatory predecessor," *Williams*, 2025 WL 3078747, at *10, particularly considering that the phrase "full reward" was not added until the regulations were updated in 2013, *Sec'y of Lab.*, 2021 WL 5359769, at *15.

25

*Waggoner*, No. 24-CV -2217, at 37-38.  Because ERISA only requires employers to provide one opportunity per year for participants to qualify for the reward under the program, *see* 42 U.S.C. § 300gg-4(j)(3)(C), Defendants' program is compliant even assuming that they are required to remove the entire annual surcharge in order to remit the "full reward," *see Bailey*, 2025 WL 2779899, at *11 ("So long as the Plan participants have at least one opportunity annually to enroll and complete [the reasonable alternative standard] and receive the full reward, the Plan complies with both the 'full reward' and 'frequency of opportunity' requirements.").

And while Plaintiff repeatedly insists that Defendants must provide an opportunity to avoid the entire annual surcharge "during the Plan year," (AC ¶¶ 45, 62), arguing that "[t]he phrase 'each year' plainly refers to the plan year in which the surcharge is imposed," (P's Opp. at 18), there is no such requirement in the statute or the Regulations, *see Buescher*, 791 F. Supp. 3d at 906-07 ("[T]he wellness program essentially works on a one-year offset.  But Plaintiff is unable to point to any language in ERISA (or elsewhere) that suggests such a program is prohibited.").  Indeed, the Plan similarly requires individuals avoiding the surcharge by satisfying the initial standard (certifying that they have not used tobacco products in the previous six months) to do so prior to the beginning of the Plan year.  (AC ¶ 37.)  *See Buescher*, 791 F. Supp. 3d at 907 (noting that defendant's program was "retrospective in nature for both those who would satisfy the original outcome-based standard and those who would satisfy the reasonable alternative standard," as the program asked the retrospective question of whether the enrollee had "used tobacco products in the prior six months," not "whether a person intends to use tobacco in the upcoming year").[11]

---

[11] Plaintiff alleges that "Defendants unlawfully create two classes of participants:  those who avoid the surcharge by completing the program in the prior year, and those who are forced

Plaintiff further argues that "once Defendants allowed participants to satisfy the standard beyond their arbitrarily [*sic*] cutoff date in the prior year, they are legally required to provide the full reward – including reimbursement for surcharges already paid."  (AC ¶ 42.)  In other words, Plaintiff seemingly concedes that a plan allowing participants to receive the full annual amount by completing the alternative standard by a particular cutoff is lawful, but insists that allowing participants *additional* opportunities to satisfy the standard and obtain the reward prospectively renders it unlawful.  This no-good-deed-goes-unpunished interpretation is contrary to logic, *see Hernandez v. Comm'r of Soc. Sec.*, No. 21-CV-10658, 2022 WL 18402121, at *13 (S.D.N.Y. Dec. 16, 2022) ("Courts should refrain from reading a statute in a way that leads to illogical results."), *report and recommendation adopted*, 2023 WL 358780 (S.D.N.Y. Jan. 23, 2023), and it appears that even the DOL – to whose interpretation Plaintiff clings when citing the preamble – would not support such a reading of the statute, *see FAQs About Affordable Care Act Implementation (Part XVIII) and Mental Health Parity Implementation*, U.S. Dep't of Lab. (Jan.

---

to pay surcharges for part of the year simply because they took longer to complete the same program during the Plan year.  This type of plan violates § 702's prohibition against discrimination based on a health status factor and in fact allow for plans to discriminate for a portion of the plan year."  (AC ¶ 30 (cleaned up); *see id.* ¶ 32 ("This structure imposes financial discrimination on participants based solely on the timing of their compliance, creating two classes of individuals:  (1) those who avoid the surcharge entirely because they complete the program by the cutoff date, and (2) those who must continue paying surcharges for part of the year despite ultimately meeting the same requirement.").)  It thus appears that Plaintiff's problem is not that those who meet the outcome by not smoking are treated more favorably than smokers who meet the alternative – an argument she could not make, as those who certify that they are nonsmokers before November 30 and those who do not so certify but complete the program before November 30 are treated identically.  Rather, Plaintiff's gripe is that smokers who complete the program by the cutoff are treated better than those who do not complete it until later.  That is a distinction, but it is based, as Plaintiff concedes, "solely on the timing of their compliance," (*id.* ¶ 32); it is not discrimination "on the basis of any health status-related factor," 29 U.S.C.A. § 1182(b)(1), as both categories share the same health status.

9, 2014), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-18 (where plan provides a cutoff for completing reasonable alternative standard, it "is not required (but is permitted) to provide another opportunity to avoid the tobacco premium surcharge until renewal or reenrollment for coverage for the next plan year," and "[n]othing . . . prevents a plan or issuer from allowing rewards (including pro-rated rewards) for mid-year enrollment in a wellness program for that plan year").[12]  That Defendants choose to offer the opportunity for a prospective reward for those who complete the program after the cutoff does not mean they cannot impose a cutoff for the full-year reward.

Moreover, even in the Preamble on which Plaintiff relies, the example requiring retroactive rebate of the surcharge appears to address a situation where there is no preestablished reasonable alternative standard, such that the participant "may take some time to request, establish, and satisfy a reasonable alternative standard."  Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. at 33163.  In other words, the retroactive rebate is to be available where no alternative standard exists until during the Plan year.  But that logic does not apply to this case, as Defendants made a reasonable alternative

---

[12] While Plaintiff argues that this guidance pertains only to the "frequency of opportunity" requirement and does not address the "full reward" requirement, (P's Opp. at 21), the Court cannot square this reading with the portion of the statement providing that "[n]othing . . . prevents a plan or issuer from allowing rewards (including pro-rated rewards) for mid-year enrollment," *FAQs About Affordable Care Act Implementation (Part XVIII) and Mental Health Parity Implementation,* U.S. Dep't of Lab. (Jan. 9, 2014), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-18. And although Plaintiff argues that this guidance cannot "override the binding regulations issued through notice-and-comment rulemaking," (P's Opp. at 21), the agency interpretation on which she repeatedly relies is contained in the regulatory preamble, not in a "binding regulation[]," (*id.*). *See Seife.*, 440 F. Supp. 3d at 275; *Saunders*, 594 F. Supp. 2d at 355.  In any event, the Court does not base its decision on the FAQ guidance, but merely points out that it is consistent with the statute in requiring only one opportunity per year for participants to qualify for the reward under the program.  *See* 42 U.S.C. § 300gg-4(j)(3)(C).

standard readily available in advance of the Plan year and set a deadline for completion.  *See*

*Bailey*, 2025 WL 2779899, at *12 (preamble's example regarding a participant satisfying the

reasonable alternative standard at end of plan year only spoke to "what should happen with the

reward if an employer gives a participant a full year to complete a reasonable alternative

standard," and was irrelevant to validity of a plan requiring participants to satisfy the standard by

a designated date).  The Court therefore finds that Defendants' program provides participants

with at least one opportunity to receive the "full reward" by satisfying a "reasonable alternative

standard" as required by ERISA.

c.      <u>Notice Requirement</u>

Plaintiff next attacks Defendants' compliance with the requirement that "all plan

materials describing the terms of the wellness program" must also disclose "the availability of a

reasonable alternative standard."  42 U.S.C. § 300gg-4(j)(3)(E).  Her argument appears to be

based entirely on her contention that Defendants failed to provide an opportunity to obtain the

full reward under a reasonable alternative standard.  Simply put, Plaintiff contends that any

notices regarding the availability of a reasonable alternative standard were necessarily deficient

because Defendants failed to offer such a standard in a manner compliant with ERISA.  (AC ¶¶

33, 63, 70.)  Given the Court's finding that Defendants' program indeed complied with ERISA,

this argument necessarily fails.  *See Chirinian v. Travelers Cos.*, No. 24-CV-3956, 2025 WL

2147271, at *9 (D. Minn. July 29, 2025) (rejecting argument that "because [defendants] failed to

provide a 'reasonable alternative standard' that offers participants the 'full reward,' any

description of that standard in Plan materials was necessarily defective" after finding that

defendants' program complied with ERISA); *see also Bailey*, 2025 WL 2779899, at *12 (to the

same effect).

29

And although Plaintiff also alleges in conclusory fashion that "upon information and belief, Defendants fail to include the necessary disclosures in all plan materials discussing the tobacco surcharge," (AC ¶ 63), she fails to allege what documents discussing the surcharge fail to adequately disclose the availability of the alternative standard.  The only document to which she specifically refers is the Summary Plan Description, which she concedes contains such a disclosure.  (*Id.* ¶ 34.)  Her allegation that "other plan materials that discuss the tobacco surcharge, including enrollment guides, benefits summaries, and online portals, do not uniformly contain the required notice," (*id.*), is too vague to state a claim, particularly given the statute's clarification that "[i]f plan materials disclose that [a wellness] program is available, without describing its terms, the disclosure [of a reasonable alternative standard] shall not be required," 42 U.S.C. § 300gg-(4)(j)(3)(E).  It is impossible to determine from the AC whether the documents with which Plaintiff takes issue describe the terms of the wellness program, as opposed to merely disclosing that the program is available, or which among these non-"uniform[]" documents might be the ones Plaintiff alleges are deficient.

Plaintiff argues in her opposition that she need not identify the documents that lack proper notice, as "[a]t this stage of the litigation, it is nearly impossible to prove that every communication contained the requisite disclosures because Plaintiff does not have access to all Plan communications discussing the surcharge."  (P's Opp. at 23 & n.17.)   But "[a]s *Iqbal* makes clear, a plausible claim must come *before* discovery, not the other way around."  *J.V. v. Lake*, No. 23-CV-3419, 2024 WL 3236823, at *4 (S.D.N.Y. June 28, 2024) (emphasis in original).  Moreover, the problem is not that Plaintiff has failed to prove that every communication lacked the proper notice; it is that she has not identified any communication that did not provide such notice.  And there does not appear to be any reason that Plaintiff could not

30

have examined employee-facing documents such as "enrollment guides, benefits summaries, and online portals," (AC ¶ 34), to determine what notices they contain. Plaintiff's claim alleging violations of the notice requirements is therefore dismissed.

### 2.      Breach of Fiduciary Duty

Finally, Plaintiff alleges that Defendants breached their fiduciary duty by withholding the tobacco surcharges from participants' paychecks and using these funds to offset their own contributions to the Plan. (*Id.* ¶ 68.)

"As the Supreme Court has explained, 'in every case charging breach of ERISA fiduciary duty the threshold question is whether the defendant was acting as a fiduciary when taking the action subject to complaint.'" *Sec'y of Lab.*, 2021 WL 5359769, at \*18 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). A defendant acts in a fiduciary capacity when undertaking discretionary acts with respect to plan management or administration, such as "selecting investments, exchanging one instrument or asset for another, and so on." *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 367 (2d Cir. 2014) (*per curiam*); *see Sec'y of Lab. v. Macy's, Inc.*, No. 17-CV-541, 2022 WL 407238, at \*3 (S.D. Ohio Feb. 10, 2022) ("[A] person acts as a fiduciary to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, or he has any discretionary authority or discretionary responsibility in the administration of such plan."). But "ERISA's fiduciary duty requirement simply is not implicated where an employer, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan," *Amatangelo v. Nat'l Grid USA Serv. Co.*, No. 04-CV-246S, 2011 WL 3687563, at \*6 (W.D.N.Y. Aug. 23, 2011), *aff'd sub nom. Argay v. Nat'l Grid USA Serv. Co.*,

503 F. App'x 40 (2d Cir. 2012) (summary order), "such as establishing, funding, amending, or terminating a plan," *Coulter*, 753 F.3d at 367.

Plaintiff argues that her allegations involve fiduciary conduct because she challenges "*how* Defendants implemented the surcharge program and exercised discretion in its administration." (P's Opp. at 24 (emphasis in original).) "But the distinction between creation (a settlor function) and implementation (a fiduciary function) is illusory where the [plaintiff] alleges only that a discriminatory wellness program was implemented as created." *Sec'y of Lab.,* 2021 WL 5359769, at *18. Plaintiff's allegations that Defendants "acted as fiduciaries when administering the tobacco surcharge program," (P's Opp. at 24), merely accuse Defendants of carrying out the Plan as written, rather than of improperly executing discretionary functions. Because "[t]here can be no breach of fiduciary duty where an ERISA plan is implemented according to its written, nondiscretionary terms," *Plesha*, 2026 WL 279321, at *9; *see Sec'y of Lab.*, 2022 WL 407238, at *4 ("[T]he sole alleged shortcoming is the failure to include a reasonable alternative standard, and [plaintiff] offers no more than conclusory allegations that the absence of such a standard in the [Plan]'s terms resulted from any discretionary decision pursuant to plan documents by [defendant]."); *Waggoner*, No. 24-CV-2217, at 64-65 ("[S]imply administering a plan according to its terms, when the *terms themselves* are the basis for claimed breach of fiduciary duty, does not implicate the discretionary authority or control over plan administration or management . . . that normally constitutes a fiduciary act under ERISA." (emphasis in original)), these allegations are deficient.

Plaintiff also attempts to argue that, as fiduciaries, Defendants had "an ongoing duty to monitor plan operations and correct noncompliant conduct." (P's Opp. at 24.) As an initial matter, as discussed above, Plaintiff has not alleged any noncompliant conduct. *See Roe v.*

32

*Empire Blue Cross Blue Shield*, No. 12-CV-4788, 2014 WL 1760343, at *8 (S.D.N.Y. May 1, 2014) ("Because Plaintiff's argument is that Defendants enforced a Plan term that was unlawful under ERISA, the Court's determination that the Plan does not violate ERISA therefore precludes Plaintiff's fiduciary duty argument."), *aff'd*, 589 F. App'x 8 (2d Cir. 2014) (summary order).  But even if the Plan had failed to comply with ERISA, ERISA does not "impose[] a general fiduciary duty on a plan administrator to comply with each and every provision in the statute," and plan administrators "do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions." *Laurent v. PricewaterhouseCoopers LLP*, No. 06-CV-2280, 2018 WL 502239, at *3 (S.D.N.Y. Jan. 19, 2018); *see Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 185 (E.D.N.Y. 2005) ("[T]he plaintiffs' proposed construction of this statutory provision – that a plan trustee owes a fiduciary duty to depart from any provision of the plan documents which he knows to violate ERISA and/or to amend that provision – goes significantly beyond the plain command of the statute."), *aff'd*, 199 F. App'x 29 (2d Cir. 2006) (summary order).

The Court acknowledges that, while compliance with Plan terms that violate ERISA does not amount to a breach of fiduciary duty standing alone, such compliance may amount to such a breach where such terms "would require a fiduciary to engage in imprudent conduct." *Agway, Inc., Emps.' 401(k) Thrift Inv. Plan v. Magnuson*, No. 03-CV-1060, 2006 WL 2934391, at *18 (N.D.N.Y. Oct. 12, 2006) ("ERISA casts upon fiduciaries an affirmative, overriding obligation to reject plan terms where those terms would require such imprudent actions in contravention of the fiduciary duties imposed under ERISA."); *see Waggoner*, No. 24-CV-2217, at 65 (noting that although "ERISA does not impose a regime of strict liability on fiduciaries for any violation of

33

the statute," a plan administrator nonetheless "may not lean *entirely* on its adherence to the plan as a shield from liability" (emphasis in original)).  To that end, Plaintiff alleges that Defendants engaged in self-dealing by retaining the allegedly unlawful surcharges.  (*Id.* ¶¶ 46, 68.)  According to the AC, Defendants withhold the surcharge amounts from participants' paychecks; "deposit[]"[13] these amounts into Pepsi's general accounts, thus earning interest on them; and then use them to offset their own obligations to contribute to the Plan.  (*Id.* ¶¶ 46, 68.)

But as discussed above, "§ 1132(a)(2) does not provide a remedy for individual injuries distinct from plan injuries."  *Williams*, 2025 WL 3078747, at *5; *see Fisher*, 2025 WL 2484271, at *6 ("A suit under Section 1132(a)(2) is brought in a representative capacity on behalf of the plan as a whole and therefore does not provide a remedy for individual injuries distinct from plan injuries.").  Even accepting that Defendants used the surcharge funds to offset their own contributions, it is unclear how this conduct could have caused injury to the Plan, as opposed to the individuals from whom the surcharge was collected.  The amount contributed to the Plan would seemingly be the same, regardless of whether the contributions were coming from Defendants or tobacco-using participants.  *Cf. Chirinian*, 2025 WL 2147271, at *12 ("[E]ven if collecting less money from Plan participants meant that [defendant] would have to contribute more to the Plan, from a balance-sheet perspective, the Plan is no worse off.").  Indeed, it is unclear what Plaintiff is envisioning when she alleges that the funds should have been used "to support participant health coverage and wellness benefits."  (AC ¶ 47.)  The amorphous nature of these allegations makes clear that Plaintiff's fiduciary duty claim simply mirrors her claim that Defendants improperly charged individual participants, particularly given that, within the same

---

[13] It is unclear to the Court how a separate "deposit" occurred, given that the funds were withheld from participants' paychecks and thus presumably never left Pepsi's general accounts.

34

paragraph, Plaintiff takes issue with "Defendants' failure to reimburse surcharges." (*Id.*) *See Williams*, 2025 WL 3078747, at *6 ("conclusory statements" that defendant "pocketed the tobacco surcharge to the detriment of the Plan" and "enriched itself at the expense of the Plan" were insufficient to allege harm to the Plan, as "if the tobacco surcharge was indeed improperly collected, the proper remedy – and the one primarily sought by [plaintiff] – would be for the surcharge to be returned to Plan participants, and not to the Plan itself"); *Chirinian*, 2025 WL 2147271, at *11 ("[Plaintiff] alleges that as a direct and proximate result of [defendant]'s fiduciary breaches, Plan participants lost millions of dollars in the form of unlawful wellness penalties for tobacco use that were withheld from their paychecks. But this only alleges individual injuries distinct from plan injuries, which cannot support a Section 1132(a)(2) claim.").

The Court acknowledges that some recent decisions addressing fiduciary duty in the context of tobacco surcharges have held similar allegations – namely, that Defendants used funds collected as surcharges to offset their own contributions rather than depositing those funds into the Plan – sufficient to establish harm to the Plan. *See, e.g.*, *Bailey*, 2025 WL 2779899, at *18; *Waggoner*, No. 24-CV-2217, at 66-68; *Mehlberg*, 2025 WL 1260700, at *7. Nonetheless, the Court is not persuaded that such allegations reflect either fiduciary conduct or harm to the Plan. First, on the former point, Plaintiff does not allege that the Plan was designed for the surcharges, which were contemplated as part of the framework of the Plan, to cover anything other than Defendants' contributions. In other words, while Plaintiff paints Defendants' conduct as robbing the Plan of Plan assets, her grievance again seems to be with the collection of the surcharge from the participants, which is a feature of the structure of the Plan and therefore implicates a settlor rather than fiduciary function. *See Fisher*, 2025 WL 2484271, at *7 (noting that defendant was

35

"free to amend the terms of the Plan" and made clear that the surcharges were aimed at offsetting rising medical costs); *cf. Polanco v. WPP Grp. USA, Inc.*, No. 24-CV-9548, 2025 WL 3003060, at *6 n.8 (S.D.N.Y. Oct. 27, 2025) ("[W]hen designing the Plan to allow the defendants to use Forfeitures to cover employer contributions, [Defendant] was acting in its capacity as settlor, not fiduciary.").

Second, while Plaintiff frames Defendants' use of the funds to offset their own contributions as depriving the Plan of Plan assets and retaining employee contributions for themselves, the crux of her allegation is that Defendants ultimately contributed less of their own funds to the Plan, not that the Plan was shortchanged.[14]  But "[c]ase law considering the issue has generally determined that unpaid employer contributions are not assets of a fund or Plan unless the agreement between the fund and the employer specifically and clearly declares otherwise," *Fisher*, 2025 WL 2484271, at *7 (collecting cases), which Plaintiff has not alleged here.  And "whether [Defendants] benefited from a reduced financial obligation to the Plan by depositing the tobacco . . . surcharges [they] collected into the Plan is irrelevant to whether the Plan experienced a loss, which the Court finds Plaintiff[] ha[s] not plausibly alleged." *Id.*; *see also Chirinian*, 2025 WL 2147271, at *12 (rejecting argument that Plan was harmed where defendant allegedly "retained monies it otherwise would have been required to contribute to the

---

[14] Moreover, while Plaintiff repeatedly refers to the collected surcharges as "plan assets," withheld wages do not become plan assets until "the earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets," which can be up to ninety days from the date that the funds were withheld, 29 C.F.R. § 2510.3-102(a),(c); *Fisher*, 2025 WL 2484271, at *8.  Thus, even if these funds ultimately became Plan assets, Plaintiff does not allege that Defendants retained these funds beyond the ninety-day limitation; rather, she alleges that the funds were ultimately used to offset Defendants' contributions to the Plan.  In other words, these employee contributions were used toward the Plan, but Defendants were required to pay less from their own accounts as a result.

plan" because plaintiff failed to explain how this benefit to defendant caused a corresponding loss to the plan).[15]

Accordingly, because Plaintiff has alleged neither fiduciary conduct nor harm to the Plan, her fiduciary duty claim is dismissed.

## IV.    LEAVE TO AMEND

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended her complaint once, (ECF No. 22), after having the benefit of Defendants' pre-motion letter, (ECF No. 16), and the discussion at the pre-motion conference, (*see* Minute Entry dated Jan. 28, 2025).  In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58

---

[15] In a supplemental letter to the Court filed on November 12, 2025, Plaintiff insists that she is not required to demonstrate loss to the Plan, as the statute also permits disgorgement of profits made through use of plan assets.  (*See* ECF No. 43 at 2.)  But again, this argument rests on the improper use of "Plan assets."  Plaintiff has plausibly established only that Defendants reduced their own financial obligations by using the tobacco surcharges collected to fund the Plan.  (*See, e.g.*, AC ¶ 75 ("By retaining the amounts of the tobacco surcharges and higher premiums associated with additional insurance, Pepsi increased its own monies and saved the money it would have had to contribute to the Plan.").)  As discussed above, funds that Defendants had not yet contributed were not Plan assets absent any agreement to that effect between Defendants and the Plan.  Indeed, Plaintiff has not alleged that the Plan required Defendants to contribute any set amount to the Plan.  Thus, the amount Defendants had to contribute to the Plan might have been less than it would have been absent the surcharges, but that does not turn the difference into assets of the Plan.

(2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*."); *see also Baines v. Nature's Bounty (NY), Inc.*, No. 23-CV-710, 2023 WL 8538172, at \*3 (2d Cir. Dec. 11, 2023) (no abuse of discretion in denying leave to amend where plaintiffs "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at \*4 n.2 (S.D.N.Y. May 27, 2020) (dismissing with prejudice where plaintiff amended following pre-motion letters and pre-motion conference that identified the deficiencies resulting in dismissal).

Moreover, Plaintiff has not asked to amend again or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this decision.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if [she] fails to specify . . . how amendment would cure the pleading deficiencies in [the] complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice "in the absence of any indication that [plaintiff] could—or would—provide additional allegations that might lead to a different result . . . ."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend); *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321, 2023 WL 2051739, at \*21

(S.D.N.Y. Feb. 16, 2023) (denying leave to amend where plaintiff "already amended its complaint in response to [Defendants'] pre-motion letter detailing the bases for its anticipated motion to dismiss" and did not seek leave to amend again).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 35, 36), and close the case.

**SO ORDERED.**

Dated: February 27, 2026
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.